**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   NV-15-1238-DFB |
| ) | |
| WESTERN FUNDING INCORPORATED; ) | Bk. No.   2:13-bk-17588-LED |
| WESTERN FUNDING INC. OF NEVADA; ) | |
| GLOBAL TRACK GPS, LLC, ) | |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| GREIF & CO., ) | |
| ) | |
| Appellant, ) | |
| v. ) | **O P I N I O N** |
| ) | |
| BRIAN D. SHAPIRO, Trustee of ) | |
| WFI Liquidating Trust; GUERIN ) | |
| SENTER; AMERICAN EXPRESS TRAVEL ) | |
| RELATED SERVICES COMPANY, INC.; ) | |
| AMERICAN EXPRESS CENTURION BANK,) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on May 19, 2016,
at Las Vegas, Nevada

Filed – June 8, 2016

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Laurel E. Davis, Bankruptcy Judge, Presiding

Appearances:     Louis Edward Humphrey, III, of Humphrey Lopez PLLC
argued for appellant Greif & Co.; Robert E.
Atkinson, of Atkinson Law Associates, Ltd., argued
for appellee Brian D. Shapiro, Trustee of WFI
Liquidating Trust.

Before:  DUNN, FARIS and BARASH,[1] Bankruptcy Judges.

_____

[1] Hon. Martin R. Barash, United States Bankruptcy Judge for
the Central District of California, sitting by designation.

DUNN, Bankruptcy Judge:

The WFI Liquidating Trust, with Brian D. Shapiro as its trustee ("Liquidating Trustee"), was established upon confirmation of the chapter 11[2] plan of the jointly administered debtors Western Funding Incorporated ("WFI"), Western Funding Inc. of Nevada and Global Track GPS, LLC (collectively "Debtors"). The confirmed plan empowered the Liquidating Trustee to litigate and settle claims belonging to the chapter 11 bankruptcy estates, provided that bankruptcy court approval be sought and obtained to settle any claims over $50,000. The Liquidating Trustee commenced litigation against American Express Travel Related Services Company, Inc. and American Express Centurion Bank (collectively "Amex") to avoid and recover over $2 million in allegedly fraudulent prepetition transfers made by WFI. Subsequently, the Liquidating Trustee requested the bankruptcy court's approval of his agreement to settle the claims against Amex for $331,476.53.

Greif & Co. ("Greif"), a beneficiary of the WFI Liquidating Trust, objected to the proposed settlement. Greif argued that the settlement amount was unacceptably small, and the Liquidating Trustee had undervalued the claims in his own complaint. Ultimately, the bankruptcy court approved the settlement. Greif

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

appeals; we AFFIRM.

## I. FACTUAL BACKGROUND

### A. Events leading up to and including confirmation

WFI was a servicer of subprime auto loans. In 2010, Harbor Structured Finance LLC, a Delaware entity controlled by Frederick and Katherine Cooper, acquired WFI. The Coopers were appointed to management positions in WFI. They established Amex credit card accounts for themselves and other employees. Although WFI was not the holder of any of the Amex cards, the Coopers routinely caused WFI to pay the balances on the cards. In WFI's accounting records, the Coopers designated many, but not all, of the charges on their Amex cards as business expenses.

In 2013, WFI filed a chapter 11 petition, and the case was administratively consolidated with the chapter 11 cases of the two other Debtors. On March 31, 2014, the bankruptcy court approved a joint plan of liquidation (the "Plan") for the Debtors. The Plan provided for the dissolution of the Debtors and the vesting of all property of the Debtors' bankruptcy estates in the WFI Liquidating Trust ("Trust") to be administered by the Liquidating Trustee. This vesting specifically included any claims or causes of action held by any of the Debtors' estates. Creditors of the Debtors' estates became beneficiaries of the Trust. The Plan gave the Liquidating Trustee the "exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate" any claim "and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval" of the

3

bankruptcy court. The Plan also permitted the Liquidating Trustee to "sell and/or assign" claims to a third party to be pursued for the assignee's "own benefit." The only stated limitation on the Liquidating Trustee's settlement authority was that bankruptcy court approval would be required to settle any claim seeking to recover more than $50,000. Neither the procedure for requesting such approval nor the criteria for granting it were specified. The Trust was to be administered according to a WFI Liquidating Trust Agreement ("Trust Agreement"), which authorized the Liquidating Trustee, among other things, to settle actions in his "good faith judgment."

**B.     The adversary proceeding and the settlement**

Several months later, the Liquidating Trustee filed an adversary proceeding complaint against Amex, seeking to recover allegedly fraudulent transfers. The transfers at issue were the payments made by WFI to Amex on the Coopers' credit card accounts. In the complaint, the Liquidating Trustee alleged that the "overwhelming majority" of the credit card charges were for personal expenses of the Coopers and other employees. Because the charges were for personal rather than business expenses, the Liquidating Trustee alleged that WFI did not receive reasonably equivalent value in exchange for paying them. In the two years preceding WFI's bankruptcy filing, the charges totaled over $2 million. The complaint asserted the following theories of avoidance and recovery:[3]

---

[3] The complaint also included a claim for recovery of preferential transfers, in the event Amex was determined to be a
(continued...)

4

1. The transfers were avoidable under § 548(a)(1)(B)(ii) because the transfers were made at a time when WFI either was insolvent or was about to engage in transactions leaving it with unreasonably small capital ("Insolvency" theory).

2. Some of the transfers were avoidable under § 548(a)(1)(B)(ii)(IV) because they were "made under an employment contract for the benefit of an insider, outside the ordinary course of business" ("Employment Contract" theory).

Amex contacted the Liquidating Trustee to initiate settlement negotiations on December 8, 2014, approximately two weeks after the complaint was filed. Five months later, the parties reached a settlement, and the Liquidating Trustee filed a motion with the bankruptcy court seeking approval of the settlement ("Settlement Motion"). Amex agreed to pay $331,476.53 to the Trust in exchange for dismissal of the adversary proceeding and a mutual release of claims, and Amex would be entitled to an allowed general unsecured claim under the Plan in the amount of the settlement payment.

The Liquidating Trustee took the position that, because he derived his authority not from the Bankruptcy Code but from the terms of the confirmed Plan and the Trust Agreement, he was not a "trustee" as that term is used in the Code and Rules. Thus, he argued that standards governing settlement motions by bankruptcy trustees were not applicable. The Liquidating Trustee argued he was entitled to "greater deference in approval of settlements"

---

[3](...continued)
prepetition creditor of WFI.

based on the Plan and Trust Agreement, but he contended that the Settlement Motion should be approved regardless of whether the bankruptcy court accepted that argument.

In the Settlement Motion and an accompanying declaration, the Liquidating Trustee went on to analyze the settlement under the factors enumerated in Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th Cir. 1986) (the "A & C Factors"). The Liquidating Trustee recognized the claims asserted in the complaint were susceptible to factual dispute. In particular, though the Liquidating Trustee believed certain of the charges in question were "easily identified" as personal, he acknowledged that others were subject to dispute as to whether they were legitimate business expenses that may have provided value to WFI. Likewise, the Liquidating Trustee believed that WFI was undeniably insolvent at the petition date and that the evidence "strongly supported" a finding of insolvency at least nine months earlier. Yet he recognized the difficulty in proving that, as he suspected, the insolvency period had begun much earlier still. He concluded:

> In my business judgment, compromise results in a fair and reasonable recovery for the estate, factoring in the overall recovery, my estimate for success in the resolved matter, and the significant costs and delay necessarily associated with litigating in an effort to obtain greater recovery.
>
> . . . Furthermore, the compromise represents an immediate recovery for the Liquidating Trust that will allow for payment of a large portion of the outstanding administrative expenses, which in turn maximizes the probability that future recoveries will allow for meaningful distribution to general unsecured creditors, and makes additional funds available for payment of cost[s] and expenses in pursuit of other causes of action.

6

. . . Accordingly, I assert that the compromise is in the best interest of the bankruptcy estate's creditors.

**C.    The dispute over the Settlement Motion**

Two creditors, Greif and Guerin Senter, expressed views on the settlement. Mr. Senter supported and joined in the Settlement Motion, but Greif vigorously opposed it. Greif complained that the proposed settlement would pay subordinated administrative claims, including Mr. Senter's claim, but other creditors would likely receive nothing. Greif wanted the Liquidating Trustee "to present the relevant facts and legal analysis surrounding the claims asserted [in the complaint] (and an explanation of why some theories were left out)" to allow the bankruptcy court to evaluate the Settlement Motion. Greif presented its own analysis of the Insolvency and the Employment Contract claims, along with an additional theory of recovery under § 548(a)(1)(A), which the Liquidating Trustee did not assert ("Fraudulent Intent" theory).

Concerning the Insolvency theory, Greif believed WFI likely became insolvent in August 2010 and was rendered "even more leveraged" after a March 2012 transaction. Greif argued that these facts supported greater recovery. As to the Employment Contract theory, Greif noted that insolvency is not an element and questioned the lack of discussion of this theory in the Settlement Motion. Regarding both theories, Greif demanded additional details concerning the methodology by which the parties arrived at the settlement amount, as well as information concerning the expected difficulty and expense of prevailing in litigation. Finally, Greif asked the bankruptcy court to require

7

the Liquidating Trustee to justify his decision not to pursue a Fraudulent Intent claim.

The Liquidating Trustee filed a reply to Greif's objection in which he provided some of the additional information Greif requested. He explained that the settlement amount was based on calculations using two "estimates in compromise" between himself and Amex. First, the parties had divided the universe of questioned credit card charges into two categories, which the Liquidating Trustee called "Type 1" and "Type 2" charges. Type 1 charges were those that the Coopers had not designated as business expenses. Type 2 charges were those that were designated as business expenses, though the Liquidating Trustee disputed the accuracy of that designation. For purposes of calculating the settlement amount, the parties agreed to treat all Type 1 charges and exactly half of the Type 2 charges as having provided no value to WFI. Second, the parties agreed, again as an "estimate in compromise," that WFI "would probably be found to be 'insolvent' . . . from January 2013 onward." The Liquidating Trustee emphasized that the parties had disagreed during negotiations as to the correct insolvency date and had chosen January 2013 "in the interest of settling the matter." The settlement amount was calculated by adding together all of the Type 1 charges and half of the Type 2 charges incurred beginning in January 2013.

The Liquidating Trustee disagreed as well with Greif's argument that he had undervalued other theories of recovery. Discussing each of Greif's suggested theories, the Liquidating Trustee concluded that they did not significantly alter the

8

reasonableness of the settlement. Regarding the Employment Contract theory, the Liquidating Trustee explained that the only transfers arguably avoidable under this theory were relatively small and had little effect on the value of the claims as a whole.

Concerning the likelihood of success in the litigation, the Liquidating Trustee noted that the Coopers had a strong incentive to testify in favor of Amex, because their own interests would be served by asserting a legitimate business purpose for the disputed charges. The Liquidating Trustee estimated the costs of litigation at $125,000, including the cost of hiring insolvency experts, but he noted that this was a "very rough" estimate, as "costs for the case could spiral out of control . . . without any guarantee of recovery[.]" Already having paid the unsubordinated administrative claims, the Liquidating Trustee pointed out that the settlement would allow the subordinated administrative claims to be paid in full, with some funds remaining. This, he reasoned, was in the best interests of the unsecured creditor body as a whole, notwithstanding Greif's objection.

Finally, in response to Greif's argument that he should have asserted a Fraudulent Intent claim, the Liquidating Trustee explained that he believed such a claim was unsupportable. "If there was any nefarious motive to [WFI]'s payment of the Coopers' expenses, it is far more likely to have been the Coopers' greed than [WFI]'s desire to dodge creditors." With no evidence that WFI made any transfers with the intent to hinder, delay or defraud creditors, the Liquidating Trustee argued he could not have prevailed on the Fraudulent Intent theory.

9

One day before the initially scheduled hearing on the Settlement Motion, Greif filed a supplemental objection, including 597 pages of attachments. Greif focused primarily on its disagreement with the Liquidating Trustee's positions on the Fraudulent Intent and Employment Contract theories. Greif argued the facts supported a finding of multiple "badges of fraud" in support of a Fraudulent Intent claim. Regarding the Employment Contract theory, Greif cited scholarly commentary arguing that any payments to an insider having an employment contract were avoidable, whether or not the payments were made pursuant to that contract. Regardless of whether the court accepted this view, Greif argued that expense reimbursement provisions in the Coopers' contracts sufficed to bring all Type 1 and Type 2 charges within the scope of the Employment Contract theory. Otherwise, the supplemental objection further elaborated Greif's arguments that the Liquidating Trustee's insolvency analysis was flawed.

The Liquidating Trustee submitted a reply with 161 pages of exhibits. He now provided his own analysis of the "badges of fraud," repeating his position that the Coopers' apparent intent to misuse WFI's funds did not equate to the requisite intent by WFI to hinder, delay or defraud creditors. Considering a list of badges of fraud identified both by the Ninth Circuit and in the Uniform Fraudulent Transfer Act,[4] the Liquidating Trustee

---

[4] The Trustee acknowledged that the Uniform Fraudulent Transfer Act was not directly applicable, because his claims sounded under § 548, which does not depend on state law, as

(continued...)

10

explained his conclusion that the facts did not support an avoidance claim based on Fraudulent Intent. He maintained that Greif overestimated the value of the Employment Contract theory, both because Greif's preferred interpretation of the statute was unlikely to be adopted by any court, and because he foresaw significant factual obstacles to recovery on that theory. Likewise, the Liquidating Trustee stood by his insolvency analysis as previously articulated.

On the same day the Liquidating Trustee filed his reply to the supplemental objection, Greif filed a motion asking the court to compel the Liquidating Trustee to assert a Fraudulent Intent claim or, in the alternative, to grant Greif derivative standing to pursue such a claim "on behalf of the estate." This motion repeated and elaborated at substantial length on Greif's previous analysis of this subject. Because the hearing on the Settlement Motion was now only a week away, Greif filed a separate request that its new motion be consolidated with and considered simultaneously with the Settlement Motion. The Liquidating Trustee opposed this request, and the bankruptcy court denied it prior to the Settlement Motion hearing.

**D.    The hearing on the Settlement Motion**

After hearing oral argument from Greif and the Liquidating Trustee, the bankruptcy court announced its findings and conclusions on the record. The bankruptcy court agreed with the Liquidating Trustee that the A & C Factors were not applicable to

[4](...continued)
opposed to § 544, which does.

11

"this post-confirmation determination." Applying Nevada law, the bankruptcy court concluded that the "good faith judgment" language in the Trust Agreement imposed a business judgment standard on the Liquidating Trustee. The court found that the proposed settlement was "the product of the liquidating trustee's good faith and informed decision reached after an extensive analysis of all legal and factual issues." The court noted that the Liquidating Trustee's analysis of the issues supported a determination that victory against Amex was "less clear cut than Greif appears to argue."

As requested by the Liquidating Trustee, the bankruptcy court went on to make findings concerning the A & C Factors, which the court enumerated as follows: "A, the probability of success in the litigation; B, the difficulties [i]f any to be encountered in the [matter] of collection; C, the complexity of the litigation and the expense, inconvenience and delay necessarily attending it; D, the paramount interest of the creditors and proper deference to their reasonable views in the premises." Hr'g Tr. (July 6, 2015) at 31:13-19. The bankruptcy court found that, although collection was not a concern, the Liquidating Trustee had established that the A & C Factors overall weighed in favor of the settlement. The court was persuaded by the Liquidating Trustee's argument that "the complexity of these issues will require substantial expense and delay without a corresponding increase of the probability that [he] will prevail to the extent Greif argues."

Having denied the request for expedited consideration of Greif's derivative standing motion, the bankruptcy court

12

nevertheless reviewed that motion and took into consideration Greif's discussion of "causes of action that were and were not brought by the liquidating trustee."  Still, the bankruptcy court expressly declined to decide the derivative standing motion, opining that it would not be "procedurally proper" to do so under the circumstances.  The court granted the Settlement Motion, but the order approving the settlement included a provision delaying its effectiveness for two weeks to give Greif a further opportunity to offer to purchase the claims against Amex.  After the two-week period expired, the Liquidating Trustee reported that Greif had made no offer, and the order became effective. This timely appeal followed.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(O).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUE

Whether the bankruptcy court abused its discretion in granting the Settlement Motion.

## IV.  STANDARDS OF REVIEW

We review a bankruptcy court's decision to approve a motion to settle and compromise for abuse of discretion. Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.), 292 B.R. 415, 420 (9th Cir. BAP 2003).  A bankruptcy court abuses its discretion only if it fails to apply the correct legal standard or applies it in a way that is illogical, implausible or unsupported by the record.  United States v. Inouye, ___ F.3d ___, ___, 2016 WL 2641109 at *3 (9th Cir.

13

May 31, 2016); United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). We may affirm the decision of the bankruptcy court on any basis supported by the record. See Hooks v. Kitsap Tenant Support Servs., Inc., 816 F.3d 550, 554 (9th Cir. 2016); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

In general, a chapter 11 plan is interpreted as a contract, and we review its interpretation de novo. Dolven v. Bartleson (In re Bartleson), 253 B.R. 75, 78-79 (9th Cir. BAP 2000).

## V. DISCUSSION

### A. The proper standard

The threshold question in this appeal is what standard(s) the bankruptcy court was required to apply in deciding the Settlement Motion. Applying Nevada law to interpret the Plan and Trust Agreement, the court concluded that a business judgment standard was appropriate. Greif argues that the proper standard is the "fair and equitable" standard that ordinarily governs settlement motions by bankruptcy trustees.

We agree with the bankruptcy court that the standards governing motions by bankruptcy trustees appointed under the Bankruptcy Code are not necessarily applicable to the trustee of a liquidating trust established under the terms of a confirmed chapter 11 plan. Notwithstanding his title, the Liquidating Trustee is not a "trustee" under § 323(a). Rather, he is a "representative" under § 1123(b)(3)(B), empowered by the terms of the Plan to prosecute and settle claims previously belonging to the Debtors' estates. Granted, a § 1123(b)(3)(B) representative

14

is "the functional equivalent of a trustee" in some regards. Beck v. Fort James Corp. (In re Crown Vantage, Inc.), 421 F.3d 963, 973 (9th Cir. 2005) (liquidating trustee is equivalent of trustee for purposes of Barton doctrine). It does not follow, however, that his powers and duties are identical to those of a trustee under the Bankruptcy Code.

Greif asks us to hold that postconfirmation settlements negotiated by liquidating trustees are subject to the same standards as settlements negotiated by bankruptcy trustees or debtors in possession. We decline to impose such an across-the-board requirement. "[T]he hallmark of chapter 11 is a flexibility in which the content of plans is primarily up to the genius of the drafter." The Alary Corp. v. Sims (In re Associated Vintage Grp., Inc.), 283 B.R. 549, 560 (9th Cir. BAP 2002). The confirmed Plan exhibited that flexibility by permitting the Liquidating Trustee to settle claims under $50,000 without bankruptcy court oversight, while requiring approval for settlement of larger claims. The provision allowing settlement of smaller claims without approval is not implicated here, and Greif does not attack it directly. Instead, we understand Greif to argue that, where a plan requires bankruptcy court approval of a settlement, that approval must be sought under the "fair and equitable" standard. We see no reason to read this standard into the Plan where the drafters have omitted it. Greif's concern about the ability of a "target insider" to exploit the availability of less searching review of settlements by "liquidat[ing] inside of a Chapter 11 rather than a Chapter 7" is unpersuasive. Apart from the fact that no insider is a party to

15

the claims at issue here, creditors desiring greater control over settlements may lobby for it through the ordinary voting and confirmation process.

Unfortunately, though the Plan makes no reference to the "fair and equitable" standard, neither does it expressly provide for any other standard by which to evaluate those settlements requiring approval. To fill the gap, the bankruptcy court turned to paragraph 5.1 of the Trust Agreement, requiring the Liquidating Trustee to exercise "good faith judgment, in the best interests of the Liquidating Trust Beneficiaries and to maximize net recoveries and distributions[.]" The bankruptcy court analogized this to the "business judgment" standard under Nevada law and concluded it was satisfied. Rather than decide whether this interpretation was correct, we simply conclude that the applicable standard under the Plan was something less exacting than the A & C Properties standard.[5] Because the bankruptcy court made findings and conclusions based upon consideration of the A & C Factors, and because we may affirm on any basis supported by the record, we review these findings and conclusions. If we conclude the court's determination under this standard was not an abuse of discretion, it follows necessarily that the lesser standard of the Plan and Trust Agreement was satisfied as well.

---

[5] We note that the A & C Properties standard itself includes a requirement of good faith on the part of the trustee. In re A & C Props., 784 F.2d at 1381 ("It is clear that there must be **more than** a mere good faith negotiation . . . ." (emphasis added)). The Liquidating Trustee's good faith is not questioned.

16

**B.    The A & C Factors**

"Basic" to the process of approving compromises by bankruptcy trustees "is the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968), quoted in In re A & C Props., 784 F.2d at 1382. Approval of a settlement requires "a sufficient factual foundation which establishes that it is fair and equitable," but "where the record supports approval of the compromise, the bankruptcy court should be affirmed." 784 F.2d at 1383.

In assessing whether a settlement is fair and equitable, bankruptcy courts must consider the following factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. at 1381. Each factor need not be treated in a vacuum; rather, the factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation. See, e.g., In re Pac. Gas & Elec. Co., 304 B.R. 395 (Bankr. N.D. Cal. 2004) ("factors as a whole" favored settlement); In re WCI Cable, Inc., 282 B.R. 457, 472-73 (Bankr. D. Or. 2002) (approving settlement despite high probability of success where litigation costs "extremely high").

The bankruptcy court stated at the Settlement Motion hearing that it had considered all the filings related to the Settlement Motion, including Greif's opposition and Mr. Senter's support of

17

the settlement, along with the Liquidating Trustee's and Greif's oral arguments. The court correctly identified the applicable factors and found that continuing to litigate would "require substantial expense and delay without a corresponding increase of the probability that the liquidating trustee will prevail to the extent Greif argues." This statement reveals that the bankruptcy court predicated its findings on (i) its assessment of the probability of success should the Liquidating Trustee try the case; (ii) the "substantial" anticipated expenses and delays involved in litigation; and (iii) its evaluation of Greif's views on the subject.[6]

On appeal, Greif devotes much of its argument to the merits of the claims the Liquidating Trustee proposed to settle, including the hypothetical Fraudulent Intent claim.[7] Greif criticizes the Liquidating Trustee's legal and factual analysis of his claims and suggests the calculation of the settlement amount was based on false premises. Having presented its own detailed analysis of the claims, Greif now argues that the bankruptcy court erred by failing to "assess the actual merits of the parties' legal and factual positions."

A trustee seeking approval of a settlement is not required to prove it would have been impossible to obtain a superior

---

[6] The bankruptcy court noted there was no reason to expect difficulty in collecting on a judgment against Amex.

[7] Though no Fraudulent Intent claim was asserted in the complaint, it is undisputed that any potential Fraudulent Intent claim would be extinguished by the mutual release contained in the settlement agreement.

18

result by trying the case. If this were required, the settlement approval process would degenerate into a trial of the underlying claims, which would defeat the purpose of settling. Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 423 (9th Cir. BAP 1997) (court should "canvass the issues" rather than conduct "mini trial" of underlying claims). It would also frustrate negotiations, because it would prevent the trustee from making any material concessions in the interest of compromise. The settlement amount was the product of negotiation and compromise and was not presented as a conclusive determination of the merits of the claims being settled.

We make these observations to clarify the scope of our review in this appeal. We are not called upon to decide the merits of the claims asserted in the adversary proceeding, nor must we decide whether the Liquidating Trustee's factual and legal analysis of the claims was correct in every particular. It is the bankruptcy court's findings and conclusions, not the Liquidating Trustee's analysis of his claims, that we review for abuse of discretion. With these principles in mind, we address Greif's arguments regarding areas in which the record purportedly fails to support the bankruptcy court's decision.

### 1. The Employment Contract theory

The Liquidating Trustee admitted that this theory played little role in the settlement calculations. He explained that he considered it a "backstop" to the more important Insolvency claims. Greif argues that, on the contrary, virtually every transfer within the two-year reach-back period was avoidable on this theory. Greif presented a detailed explanation of how it

19

would have gone about arguing this claim. Then, effectively deeming its own position to be irrefutable, Greif faulted the Liquidating Trustee for not adopting that position in his settlement negotiations. Now, Greif argues that the bankruptcy court abused its discretion because it did not "earnestly assess" the contending views on the subject.

As explained above, we are not called upon to decide whether the claim ultimately would or should have been decided in the way Greif asserts. The fact that the Liquidating Trustee did not negotiate the claim in the way Greif would have liked also is not dispositive. It is possible that, if the Liquidating Trustee had adopted Greif's position at trial, he would have prevailed. It is possible he could have obtained a greater settlement by presenting this argument during negotiations. But based on the record, neither of these outcomes was so likely as to preclude a finding that the settlement was fair and equitable.[8]

Because the claim does not depend on a showing of insolvency or other financial distress, Greif also argues that the expense of litigating it is substantially less onerous compared to the Insolvency claims. Unfortunately, there is no reason to suppose Amex would have been willing to pay to settle the other claims while leaving the Employment Contract claim unresolved. Unless

---

[8] Among other things, the Employment Contract Theory was vulnerable to the argument that the questioned transfers were made in the ordinary course of business, and that they provided value to WFI because they offset WFI's obligations to the Coopers. Greif argues that these defenses could be overcome, but again, victory was not so assured as to deprive the court of a basis on which to conclude the settlement was fair and equitable.

20

the Liquidating Trustee had been willing to forgo the other claims and hang his entire case on § 548(a)(1)(B)(ii)(IV) - a risky proposition given the Liquidating Trustee's doubts about the claim's value - this strategy would not necessarily have helped avoid costs. In short, Greif has not shown that the bankruptcy court so overestimated the expense of litigation as to render its decision an abuse of discretion.

### 2. **The Insolvency theory**

According to Greif, the "linchpin" of the settlement was the "agreed upon insolvency date of January 1, 2013." Greif implies this "agreed upon" date resulted in an inappropriately low settlement amount, and the bankruptcy court abused its discretion by allowing the Liquidating Trustee to accept it.

This argument mischaracterizes the nature of the settlement. Parties to a settlement need not (and generally do not) "agree" on the objectively correct resolution of the facts in dispute. The Liquidating Trustee made clear that he argued during negotiations that WFI had become insolvent before January 1, 2013, while Amex argued for a later date. The parties simply settled on that date in the interest of compromise. The question before the bankruptcy court was not whether the estimated date was correct, but whether the settlement based on that estimate was fair in light of the A & C Factors. We are not persuaded that the estimate was so obviously wrong as to undermine the overall fairness of the settlement.

Otherwise, Greif argues that the bankruptcy court should have required the Liquidating Trustee to hire an insolvency expert to explore the issue more fully before settling.

21

Recognizing that this was one of the expenses the Liquidating Trustee hoped to avoid by settling, Greif argues that the Liquidating Trustee at least should have provided specific evidence of how much it would cost to hire an expert. It is true that the bankruptcy court must have an adequate record on which to base its decision, and specific information about the projected costs of an insolvency investigation might have been useful. Nevertheless, we conclude that the record before the bankruptcy court was adequate. As the court recognized, the heated disagreement between Greif and the Liquidating Trustee, concerning the insolvency issue among others, demonstrated that resolution of the claims would not be easy or inexpensive.

**C.   Derivative standing**

The bankruptcy court denied Greif's request to expedite consideration of its motion for derivative standing. In the order granting the Settlement Motion, however, the bankruptcy court allowed Greif additional time to make an offer to purchase the Trust's claims against Amex. During the hearing, the Liquidating Trustee's counsel indicated he would entertain an all-cash offer from Greif, but not a credit bid as Greif apparently had suggested in previous discussions. Greif argues that the bankruptcy court should have required the Liquidating Trustee to entertain other offers, such as a credit bid, or should have granted the derivative standing motion.

Though the bankruptcy court did not decide the derivative standing motion, it expressed its doubt that such a motion was cognizable: "[W]e're looking at post-confirmation powers granted to a liquidating trustee. We're way beyond a case pending under

22

Chapter 11. . . . So I think we have a limited number of options available[.]"[9] Hr'g Tr. (July 6, 2015) at 16:15-20. The denial of Greif's request for expedited consideration of the derivative standing motion is not on appeal, and we need not consider whether such a motion could have been granted.

We have held, however, that a trustee must consider offers from creditors to purchase claims the trustee wishes to settle. This is because settlement of a claim that is property of the estate is equivalent to a sale of that claim to the defendant. In re Mickey Thompson Entm't Grp., Inc., 292 B.R. at 421. Where an interested party offers to purchase a claim in exchange for a sum certain plus a percentage of net proceeds, the trustee must take the percentage into account in determining whether the bid is superior to an all-cash offer from the defendant. Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 288-90 (9th Cir. BAP 2005). The trustee should not reject out of hand all offers that include a non-cash component. Id.

In contrast to Lahijani, however, there is no indication in the record that Greif made any offer to purchase the claims, either before or after the Liquidating Trustee expressed his unwillingness to entertain non-cash offers. Certainly, there is nothing to suggest Greif made an offer consisting of a sum

---

[9] The "limited number of options" to which the bankruptcy court referred included the Plan provision allowing the Liquidating Trustee to "sell and/or assign" claims to be pursued by the purchaser or assignee "for its own benefit." The Liquidating Trustee argues this provision permits only outright sale, not derivative standing, but the bankruptcy court did not decide the question, and neither do we.

23

certain plus a percentage of proceeds or that Greif had any intention of doing so if given the opportunity. The Liquidating Trustee rejected Greif's suggestion of making a credit bid for the claims. Considering the difficulties inherent in determining the value of a credit bid by an unsecured creditor beneficiary of an insolvent liquidating trust, we conclude that the Liquidating Trustee was not obligated to entertain this novel suggestion.

## VI.  CONCLUSION

Based upon the foregoing, we conclude that the bankruptcy court did not abuse its discretion in granting the Settlement Motion.  We AFFIRM.

24