

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>JOSEPH L. SANDERS,<br><br>           Debtor. | BAP No. CC-23-1003-LSF<br><br>Bk. No. 8:21-bk-12001-TA |
| JOSEPH L. SANDERS,<br><br>           Appellant,<br><br>v.<br><br>JOHN WATCHER; MABEL WATCHER;<br>KAREN S. NAYLOR, Trustee,<br><br>           Appellees. | **MEMORANDUM**\* |

Appeal from the United States Bankruptcy Court
for the Central District of California
Theodor C. Albert, Chief Bankruptcy Judge, Presiding

Before: LAFFERTY, SPRAKER, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Debtor Joseph L. Sanders appeals the bankruptcy court's approval of

a settlement pursuant to Rule 9019[1] between the chapter 7 trustee, Karen S.

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532 and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

1

Naylor (the "Trustee"), and creditors, John and Mabel Watcher (jointly with the Trustee, "Appellees"). Because we discern no error, we AFFIRM.

**FACTS[2]**

**A.    Prepetition events**

In 2018, John and Mabel Watcher, ages 92 and 85, began litigation in Orange County Superior Court entitled *John Watcher v. American Bankers, LLC, Rick Floyd, Joseph L. Sanders, et al.* (the "State Court Litigation"). The State Court Litigation was based on loans made by Rick Floyd to others through his entity American Bankers, LLC ("American Bankers"), in part using $955,000 the Watchers had advanced for that purpose. Two of the American Bankers' loans were made to Sanders; one dated April 7, 2016 for $110,000 with interest at 11.75% secured by Sanders' real property located at 30269 Callaway Circle, Murrieta, CA (the "Callaway Circle Property"); and one dated November 15, 2016 for $283,000 with interest at 10.99% secured by Sanders' real property located at 1 Half Moon Bay, Corona Del Mar, CA (the "Half Moon Bay Property"). American Bankers was the payee on the promissory notes and the beneficiary of the two deeds of trust. The Watchers received payments from Rick Floyd and American Bankers on their investment including the two Sanders loans until approximately February 2018 when the payments stopped.

---

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

The Watchers attempted to serve their complaint on Sanders for almost a year and a half and finally, with state court approval, served him by publication. Sanders did not answer the complaint and on April 8, 2021, the state court entered a default judgment against him and in favor of the Watchers on the conversion cause of action in the amount of $914,000 in general damages, and $2,472,000 in treble damages,[3] for a total of $3,386,000 plus costs of suit. The default judgment included damages of $31,244,000 against Floyd and American Bankers as well as reformation of the two Sanders promissory notes which substituted the Watchers as the lender instead of American Bankers, and reformation of the two deeds of trust on Sanders' properties which substituted the Watchers as the beneficiary of each.

In early 2022, Sanders obtained an order from the state court vacating the default and judgment against him, permitting him to defend himself. The basis for vacating the judgment was Sanders' declaration that he had no knowledge of the suit. The Watchers appealed that order, and the appeal was pending when the settlement at issue here was reached. The set-aside order did not alter the judgment against Floyd or American Bankers which is now final.

---

[3] The default judgment does not specify the basis for the treble damages but the Watchers assert that it was based on California Penal Code § 496(c) – receiving stolen property.

**B.     Sanders' bankruptcy case**

Sanders filed a chapter 11 petition in 2021. He disclosed ownership interests in ten real properties with a total value of $13 million. Secured debt on those properties exceeded $11.6 million which included the judgment amount owed to the Watchers of $3,386,000. Unsecured debt was listed as approximately $155,000 owed on several credit cards and no priority debt.

Two months into the chapter 11 case, the United States Trustee filed a motion to convert the case to chapter 7 which the bankruptcy court granted.

**C.     Activities in the chapter 7 case**

**1.     The sale of the Half Moon Bay Property**

On June 28, 2022, the bankruptcy court approved the Trustee's sale of the Half Moon Bay Property to a third party for $6,060,000.[4] The sale closed on July 29, 2022 with the estate receiving $3,334,466.29 after payment of the costs of sale and undisputed secured claims. Of that, the Trustee ultimately paid Sanders $350,000 in settlement of a dispute regarding his homestead exemption claim.[5] The Watchers' lien attached to the remaining proceeds.

---

[4] The property had been listed in Sanders' initial schedule A/B at $3,500,000.

[5] In his schedule C, Sanders claimed a $600,000 homestead exemption in real property located at 1049 Baja Street, Laguna Beach, CA 92651, even though his petition listed his residence as the Half Moon Bay Property. He later amended schedule C to claim the exemption on the Half Moon Bay Property. The Trustee objected to the exemption on the Half Moon Bay Property as part of her motion to approve the sale of that property.

**2. The Watchers' proof of claim**

The Watchers filed their proof of claim on February 18, 2022 asserting a secured claim of $4,262,220.26. The claim had four basic components:

(i) a $283,000 equitable lien granted by the Superior Court on March 7, 2019 and recorded against the Half Moon Bay Property;

(ii) $419,383.83 owed under the Half Moon Bay Property deed of trust, which included accrued interest as of February 15, 2022;

(iii) $173,836.43 owed under the Callaway Circle Property deed of trust, with accrued interest as of February 15, 2022; and,

(iv) the State Court Litigation judgment of $3,386,000 secured by abstracts of judgment filed in Orange County and Riverside County on June 16, 2021 (i.e., within the preference period).

The amounts in the proof of claim did not include prepetition and postpetition attorney's fees and costs.

On August 29, 2022, Sanders filed an objection to the Watchers' proof of claim. At the initial hearing on the objection, the bankruptcy court set an evidentiary hearing for December 13, 2022.

**3. The Watchers' motion to estimate their claim**

On August 9, 2022, the Watchers filed a motion to estimate their claim at "$4,518,287.77 pursuant to § 502(c) as a final claim for purposes of distribution." In the motion, they broke down the amount of their claim as follows:

5

(i) $741,790.24 as secured by the net proceeds of the sale of the Half Moon Bay Property as required by the Sale Order;

(ii) $390,397.53 as secured by the Deed of Trust on the Callaway Property; and,

$3,386,000 as an unsecured claim.

The secured claim on the Half Moon Bay Property included approximately $270,000 of attorney's fees and interest through June 10, 2022. The secured claim on the Callaway Circle Property included approximately $135,000 in attorney's fees and interest through July 2022.

The Watchers included with their motion to estimate their claim a declaration of creditor Sandra Shohat who stated that she was a personal friend of Sanders and Floyd. She stated that she personally knew of the State Court Litigation between the Watchers and Sanders and that she had text messages (which copies were attached) that establish that Sanders knew of the existence of the State Court Litigation as well, even though he declared to the state court that he was unaware that he had been sued by the Watchers.

Sanders opposed the motion to estimate the claim arguing that the Watchers' claims against him had no merit, contending that the claims could and should be "resolved with an expedited trial in the state court," and generally attacking the Watchers.

The Trustee filed a statement of position and partial joinder to the motion advising the bankruptcy court that she supported and joined the Watchers' request for estimation of the claim except that she took no

position on whether the amount of attorney's fees included in the claim were reasonable or otherwise allowable in the amount requested.

The bankruptcy court requested further briefing and at a hearing on September 7, 2022, ordered the parties to attend mediation. The motion was ultimately taken off calendar based on the settlement between the Trustee and the Watchers as described below.

### 4. The motion to approve the Trustee's settlement with the Watchers

On September 20, 2022, prior to the mediation, the Trustee and the Watchers agreed that the Trustee would release $300,000 to the Watchers as payment of a portion of the Watchers' secured claim against the Half Moon Bay Property. The bankruptcy court approved the stipulation the same day.

The Watchers, Sanders and the Trustee attended a full-day mediation with Hon. Scott C. Clarkson on September 26, 2022. By the end of the mediation, the Trustee and the Watchers agreed on a basic structure for a settlement with a number of details to be resolved over the following weeks. Thereafter, the Watchers and the Trustee executed a Settlement Agreement. The Settlement Agreement included Sanders as a proposed party, however he did not and has not executed it.

On November 10, 2022, the Trustee filed her Motion to Approve Compromise and Settlement Between the Estate and John and Mabel Watcher Regarding Allowance of Claim (the "Settlement Motion"). The

Settlement Motion sets forth the following pertinent provisions in the Settlement Agreement:

1. The Allowed Claim. The Watchers' Claim shall be deemed allowed as of October 27, 2022 in the total amount of $1,550,000.00 (the "Allowed Claim"). The Allowed Claim shall be fixed for all purposes in the Case, including distribution pursuant to Section 726 of the Code;

2. The Components of the Allowed Claim. The Allowed Claim shall be allowed as a secured claim in the amount of $425,000.00 (the "Secured Portion of the Allowed Claim"), and a general unsecured claim in the amount of $1,125,000.00 (the "GUC Portion of the Allowed Claim");

3. Proposed Distribution from the [Half Moon Bay Property] Sale Proceeds. Upon entry of a final order granting this Motion, the Trustee will be authorized to distribute to the Watchers the sum of $425,000.00 from the [Half Moon Bay Property] Sale Proceeds, which distribution shall be in full and complete satisfaction of the Secured Portion of the Allowed Claim.

4. Potential Interim Distribution. [omitted here].

5. Payments on Account of Any Allowed Claims Owing by the Debtor to American Bankers. As set forth above, the Trustee has been informed by the Debtor that he is indebted to American Bankers on account of the Notes. The Watchers have obtained a final non-appealable judgment against American Bankers, and based thereupon have filed a notice of lien in the bankruptcy case evidencing their right to the proceeds of the Notes. Accordingly, any distribution on account of the GUC Portion of the Allowed Claim shall be applied first to the satisfaction of the Notes so as to ensure the Estate will not be

8

obligated to make any distributions directly to American Bankers on account of such Notes.[6]

6. Additional Consideration to the Estate for the Proposed Settlement. Following entry of a final 9019 Order, and payment to the Watchers of the Secured Portion of the Allowed Claim, the Watchers shall file or record a notice of reconveyance of the deed of trust they assert against the [Half Moon Bay] Property in a format satisfactory to Lawyers Title Co. In addition, upon satisfaction in full of the GUC Portion of the Allowed Claim, the Watchers shall file or record a notice of release of any interest they assert in the deed of trust against the Callaway [Circle] Property in a format satisfactory to Lawyers Title Co.

As the Watchers had just received $300,000 from the Trustee, the total settlement was $1,850,000, of which the Watchers would receive an additional $425,000 when the Settlement Motion was granted, and an unsecured claim of $1,125,000. The $725,000 in present payments approximated the amount they were owed on the Half Moon Bay Property including interest and attorney's fees through approximately June, 2022.

The Settlement Agreement did not include any general releases. It included a provision that if Sanders opposed the upcoming Settlement Motion, the Watchers would retain their rights to proceed against him

---

[6] As the Watchers claimed a lien on the debt Sanders owed to American Bankers, subsequent payments by the estate to American Bankers would be paid to the Watchers. This would result in them receiving more than the settlement amount from the estate. The parties designed Part 5 to treat the Trustee's payments to the Watchers as also a payment on Sanders' debt owed to American Bankers. Therefore, the payment to the Watchers reduced both their claim against the estate as well as American Bankers' claim against the estate.

including in their pending non-dischargeability adversary proceeding against him.

Sanders opposed the Settlement Motion arguing, as he does here, that based on the set-aside of the state court default judgment, the damages awarded against him, including the treble damages, were unliquidated and, in his view, were likely to be reduced by the state court to very little once he had a chance to defend himself. He also asserted that the bankruptcy court denied him due process by ruling on the Settlement Motion because it was a non-core proceeding. He requested an evidentiary hearing. No other party objected.

At the hearing on the Settlement Motion, the bankruptcy court heard considerable argument by Sanders, the Watchers, and the Trustee. The court adopted its lengthy tentative ruling going through the factors in *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986) in detail. It made comments focusing on the uncertainty of the cost of the litigation if it were to proceed, the delay in getting creditors paid, and the possibility that the Watchers' judgment might ultimately survive the set-aside order which could increase their claim to more than $5 million.

The bankruptcy court approved the settlement and Sanders timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err in approving the compromise between the Trustee and the Watchers?

## STANDARDS OF REVIEW

Whether a bankruptcy court has jurisdiction is a question of law reviewed de novo. *Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 34 (9th Cir. BAP 2011), *aff'd*, 708 F.3d 1123 (9th Cir. 2013). "De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014). Moreover, whether the Settlement Motion was a core proceeding giving the bankruptcy court the judicial power to rule on the Settlement Motion is a question of law which we review de novo.

We review the bankruptcy court's decision to approve a compromise for abuse of discretion. *Goodwin v. Mickey Thompson Ent. Grp., Inc. (In re Mickey Thompson Ent. Grp., Inc.)*, 292 B.R. 415, 420 (9th Cir. BAP 2003); *see In re A & C Prop.*, 784 F.2d at 1380. Similarly, "[a] court's decision whether to hold an evidentiary hearing is also reviewed for an abuse of discretion." *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)*, 503 F.3d 933, 939-40 (9th Cir. 2007).

To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, we consider whether the bankruptcy court's

11

application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (en banc).

## DISCUSSION

Sanders argues that the bankruptcy court abused its discretion for three reasons: first, the bankruptcy court should have made a specific finding on the probability of whether the Watchers would prevail should the matter proceed in state court; second, the bankruptcy court gave undue weight to the factors of delay in litigation, costs of litigation, and the ages of the Watchers; and third, the bankruptcy court considered improper factors such as Sanders' conduct in the bankruptcy case to date and his relationship with Floyd.

A. **The bankruptcy court properly identified the *A & C Properties* factors to evaluate the fairness and reasonableness of the settlement.**

Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "The bankruptcy court has great latitude in approving compromise agreements." *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988) (citation omitted). The Ninth Circuit has directed that the bankruptcy court must determine that the compromise is "fair and equitable" based on four factors:

12

(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views [].

*In re A & C Prop.*, 784 F.2d at 1381 (citation omitted). The law favors compromise, "and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed." *Id.* (citation omitted).

"Each factor need not be treated in a vacuum; rather, the factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation." *Grief & Co. v. Shapiro (In re W. Funding Inc.)*, 550 B.R. 841, 851 (9th Cir. BAP 2016), *aff'd*, 705 F. App'x 600 (9th Cir. 2017). Ultimately, "[t]he trustee, as the party proposing the compromise, has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *In re A & C Prop.*, 784 F.2d at 1381 (citation omitted).

The bankruptcy court "need not rule upon disputed facts and questions of law, but only canvass the issues. A mini trial on the merits is not required." *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (9th Cir. BAP 1997) (citations omitted).

B.   **The bankruptcy court did not err in applying the *A & C Properties* factors.**

1.   **Probability of success**

Sanders is adamant that he would be successful if he were permitted to defend himself in the State Court Litigation. He argues that the Watchers' investments were not made with him; in fact, he claims he never even met them. He argues therefore that he could not have taken their money improperly, and thus the conversion cause of action must fail. Sanders argues that the Watchers have a low probability of obtaining "any recovery."

But Sanders ignores the fact that the state court reformed the two promissory notes in favor of the Watchers and its judgment is now final. He conceded at oral argument that he was liable to the Watchers on the notes irrespective of the liens. As to the amount owed on the loans, Sanders argues that the total amount loaned to him was $393,000 (in 2016) and suggests that the recovery should be limited to that amount. This argument ignores the interest at 10.99% on the Half Moon Bay Property loan and 11.75% on the Callaway Circle Property loan and the late charges and attorney's fees to enforce the notes. With unpaid interest accruing since the payments stopped in early 2018, the total amount owed on those two loans was at least $1 million at the time of the settlement. The Watchers are entitled to receive that amount from the proceeds of the sale of the two properties irrespective of the results of the State Court Litigation.

The settlement reduced the Watchers' general unsecured claim of $3,386,000 (plus interest at 10% for the past two years if the judgment is upheld) to $1,125,000 (although payment of that amount will also satisfy

their secured claim of $400,000 on the Callaway Circle Property). The Watchers' unsecured claim will be paid pro-rata with the other unsecured creditors after payment of all administrative costs including those of the Trustee and her counsel (although it appears likely that there are sufficient funds in the estate to pay all claims in full).

The Trustee argues that the Watchers "have an ironclad conversion action against [Sanders] for wrongfully *retaining* the Watchers' stolen money in the face of multiple demands to turn over the stolen property." Appellee Opening Br. p. 23. (emphasis in original). She believes that the Watchers are likely to recover "well in excess of $1.85 million with respect to the claims." *Id.* p. 22.

The bankruptcy court acknowledged that it was unable to evaluate with any precision the likelihood that the Watchers would be successful first in getting the set-aside order reversed and then in prevailing at trial. But the court is not required to make such a finding. There is no right to a mini trial.

Given the risks and uncertainties, the bankruptcy court did not err in finding that this factor weighed in favor of the settlement.

### 2. Difficulty of collection

The parties agreed this factor does not apply.

**3. The complexity of the litigation involved, and the expense, inconvenience, and delay**

Assuming the Watchers' appeal in state court was unsuccessful, their claim would have to be liquidated. That would be a contested matter resulting in motions, discovery, and likely a lengthy trial. The litigation would be both legally and factually complex. There had been no significant activity in the state court case other than the default prove-up hearing.

Absent the settlement, the estate faced either a potential reversal of the set-aside order resulting in affirmance of the full amount of the judgment plus interest for at least two years, or litigation which was likely to be lengthy and expensive. The attorney's fees and costs incurred in continuing the litigation would likely approximate some meaningful portion of the settlement amount of $1,125,000. The Trustee's failure in the litigation could lead to the full amount of the judgment being allowed, or a $4 to $5 million claim after the expense of litigation.

Even if Sanders agreed to shoulder the cost of the litigation, which he did not and has not offered, the cost to the estate would be significant.[7] The bankruptcy court properly considered the expense, inconvenience, and delay which would be caused if the litigation continued. The bankruptcy court did not err in concluding that this factor weighed in favor of the settlement.

---

[7] Sanders' counsel's statement at oral argument that Sanders was ready to fund the litigation, assuming it is true, is too little, too late.

### 4. Best interests of the creditors

Finally, the bankruptcy court considered the "paramount interests of the creditors and gave proper deference to their views." *In re A & C Prop.*, 784 F.2d at 1381. As this appears to be a solvent estate, especially given the reduction of the Watchers' claim via the settlement, all creditors will likely be paid in full. It is in the best interest of creditors that they be paid sooner rather than later.

The bankruptcy court identified the correct legal rule via the factors set forth in *A & C Properties*. We cannot say that its application of the rule was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

## C. Sanders' further arguments fail.

### 1. Sanders was not denied due process by the approval of the Settlement Motion.

Sanders argues that the bankruptcy court "abused its discretion because the resolution of non-core claims via summary approval of the compromise without an evidentiary hearing deprived Sanders of due process."[8] Opening Br., p. 24. He argues that the conversion claim "rests on California substantive law and is, thus, not a core-proceeding" citing *Maitland v. Mitchell (In re Harris Pine Mills)*, 44 F.3d 1431, 1436 (9th Cir. 1995) to support that statement. We disagree.

---

[8] Sanders notes in his required Jurisdictional Statement in his Opening Brief that "[a]pproval of the settlement was a core proceeding pursuant to 28 U.S.C. § 157(b)." Opening Br., Pg. 10.

In *Harris Pine Mills*, a purchaser of certain assets of a bankruptcy estate sued the chapter 7 trustee in state court alleging state court causes of action. The trustee removed the matter to the bankruptcy court which thereafter entered judgment for the trustee. The purchaser asserted that the matter was not core and therefore the bankruptcy court did not have judicial power to enter a final judgment in the matter. The Ninth Circuit disagreed ruling that the claims against the trustee were core because the conduct of the trustee at issue was inextricably intertwined with the trustee's sale of property belonging to the estate. *Id.* at 1438.

The Ninth Circuit in *Harris Pine Mills* noted that a core proceeding is one that invokes a substantive right created by federal bankruptcy law which does not exist outside of bankruptcy. *Id.* Proceedings under Rule 9019 are core because the power of the trustee to settle claims is a fundamental part of federal bankruptcy law and does not exist outside of the bankruptcy realm.

Further, Congress provided in 28 U.S.C. § 157(b) a list of 16 examples of core proceedings, which included (A) matters concerning the administration of the estate; (B) allowance or disallowance of claims against the estate. . .; (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship, except personal injury tort or wrongful death claims. The Settlement Motion implicates each of the three examples. *See In re ISE Corp.*, Case No. 10-14198-MM 11, 2012 WL 1377085, at *4 (Bankr. S.D. Cal. Apr. 13, 2012)

18

(finding approval of a settlement agreement to be core proceeding) (citing *Harris v. Wittman, (In re Harris)*, 590 F.3d 730, 738 (9th Cir. 2009) (explaining that matters involving the implementation of the parties' settlement agreement was within bankruptcy court's core jurisdiction.)).

The Settlement Motion concerned the administration of the estate. *See, e.g., In re Moses*, 225 B.R. 360, 364 (E.D. Mich. 1998) ("In this case, the Bankruptcy Court's ruling on the settlement motion was a matter 'concerning the administration of the estate' because it dealt specifically with the disposition of the property of the estate."). The Settlement Agreement concerned the allowance or disallowance of a claim against the estate and adjusted the debtor-creditor relationship by ending the State Court Litigation. "[T]he restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power," *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S., 50, 71 (1982). The bankruptcy court had the judicial power to grant the Settlement Motion and to enter a final order thereon because it was a core proceeding.

Sanders also argues that he has been deprived of due process because the Watchers' claims (against him) are "speculative" and there is "no evidentiary basis" to support a judgment (against him) which is, he argues, required before the court can approve the motion. We disagree.

The Trustee settled the claim against the estate. The settlement does not finally resolve the issues between Sanders and the Watchers because of the pending non-dischargeability action. The Watchers have not released

Sanders under the Settlement Agreement which specifically provides that "in the event that [Sanders] opposes the Trustee's 9019 Motion, the Watchers reserve all of their rights and remedies to enforce their claims against [Sanders]." As Sanders opposed the Settlement Motion, the Watchers are entitled to proceed with their pending adversary proceeding against him to determine whether any amount of the debt will survive the bankruptcy proceeding. He will be able to litigate the issues at that time.

2. **Sanders has no right to an offset based on the Watchers' recoveries against other parties.**

Sanders argues that because the Watchers have apparently recovered $444,000 from three other parties in the State Court Litigation,[9] those payments "have the impact of lowering the Watchers' claims." Opening Br., p. 30-31. Sanders offers no factual or legal basis to support that position.

3. **The bankruptcy court did not err by considering Sanders' general conduct in the bankruptcy case and his relationship with Floyd.**

Sanders argues that the bankruptcy court considered improper factors such as Sanders' conduct in the bankruptcy case to date and his relationship with Floyd. Sanders takes offense to the bankruptcy court's comment that he is not "'exactly an altar boy' and had not cooperated with the bankruptcy process." Opening Br., p. 36. He argues without legal

---

[9] These payments were disclosed to the bankruptcy court by the Trustee in the Settlement Motion. Estate of Wilber Sowers, $25,000; John Edward, $170,000; and Katherine Floyd, $249,030.

support that these were improper factors "which require reversal." He cites *Jen Hung Ng v. INS*, 804 F.2d 534, 538 (9th Cir. 1986) for support but that case does not discuss which factors may or may not be proper in considering a Rule 9019 motion.

More importantly, permitting the litigation to proceed would require the Trustee to partner up with Sanders whose dependability is dubious, as evidenced by his conduct in the bankruptcy case. This is a relevant factor when considering the probability of success in what will be complex litigation. Sanders' relationship with Floyd is also relevant to the conversion claim since his entreaties that he was a stranger to the Watchers may ring hollow when considering the use of and whereabouts of the Watchers' funds. The bankruptcy court noted these anomalies and we cannot second guess the Trustee's concern.

## D.    The bankruptcy court did not err in declining to hold an evidentiary hearing.

Finally, Sanders argues that the bankruptcy court erred in rejecting his request for discovery and an evidentiary hearing. We disagree.

The bankruptcy court was within its discretion when it declined to draw out the proceedings any further with discovery and an evidentiary hearing. It was not required to make factual determinations on every disputed issue. *See In re Int'l Fibercom, Inc.*, 503 F.3d at 946 (holding that, where there was an adequate factual basis for the bankruptcy court's decision, an evidentiary hearing was unnecessary); *Aguina v. Kang (In re*

21

*Aguina)*, Case No. CC-21-1163-FLS, 2022 WL 325579, at *8 (9th Cir. BAP Feb. 3, 2022) ("Rule 9019 does not require an evidentiary hearing on every settlement agreement presented to the Court" quoting *In re Kent*, Case No. 07-BK-03238-SSC, 2008 WL 5047821, at *1 (Bankr. D. Ariz. July 25, 2008)). The bankruptcy court's decision to approve the Settlement Motion had an adequate factual basis.

## CONCLUSION

The bankruptcy court did not abuse its discretion in approving the compromise between the Trustee and the Watchers. We AFFIRM.